IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

SAMIR I. KREIT,                    §
                                   §
            Plaintiff,             §
                                   §
v.                                 §       CIVIL ACTION NO. H-04-1600
                                   §
ST. PAUL FIRE AND MARINE           §
INSURANCE COMPANY,                 §
                                   §
            Defendant.             §

MEMORANDUM AND ORDER

Pending is Defendant St. Paul Fire and Marine Insurance Company's Motion to Dismiss for Plaintiff's Failure to State a Claim or, in the Alternative, Motion for Summary Judgment (Document No. 30).[1]  After having reviewed the motions, responses, and applicable law, the Court concludes as follows:

I.   Background

Plaintiff Samir I. Kreit, M.D. ("Dr. Kreit"), *pro se*, brings this action against his former malpractice insurer, Defendant St. Paul Fire and Marine Insurance Company ("St. Paul"), asserting

---

[1] Also listed as a pending motion on the Docket Report is Dr. Kreit's "Combined Response to Defendant's Motion to Dismiss for Failure to State a Claim or, in the Alternative, Motion for Summary Judgment and Plaintiff's Motion to for [sic] Summary Judgment" (Document No. 32).  Although Dr. Kreit styles the document a motion for summary judgment, the document is in its entirety a response to Defendant's motion, and Dr. Kreit seeks no affirmative relief.  In any event, Dr. Kreit is not entitled to a summary judgment in his favor.

claims for breach of contract, bad faith, misrepresentation or negligent misrepresentation, fraud, violations of the Texas Deceptive Trade Practices Act ("DTPA"), defamation, and breach of fiduciary duty.

During the 1990s, Dr. Kreit was a licensed physician practicing medicine in the State of Kentucky.  In 1995, Dr. Kreit was sued in Kentucky state court for medical malpractice (the "Kentucky Lawsuit").  At the time, Plaintiff was insured by St. Paul under a Physicians' Professional Liability insurance policy, Policy No. DM06604143 (the "Policy").  *See* Document No. 30 ex. A. Under the Policy, St. Paul had a duty to defend, as well as a right to settle, malpractice cases filed against Dr. Kreit. Specifically, the Policy provided:

> We'll defend any suit brought against you for damages covered under this agreement.  We'll do this even if the suit is groundless or fraudulent.  We have the right to investigate, negotiate and settle any suit or claim if we think that's appropriate.

Id. ("Physicians' Professional Liability Protection--Claims Made": "Additional Benefits").  The Policy specifically defined the term "We" to mean "St. Paul Fire and Marine Insurance Company."  Id. ("Introduction").

Pursuant to its duty under the Policy, St. Paul retained counsel to defend Dr. Kreit in the Kentucky Lawsuit.  In Dr. Kreit's opinion, the Kentucky Lawsuit was "utterly frivolous" and "completely defensible."  Document No. 24 ¶ 10.  Accordingly, Dr.

Kreit refused to mediate the case and twice refused to consent to St. Paul's efforts to settle the case. *See* id. ¶¶ 11-12; *see also* Document Nos. 30 ex. B; 32 ex. 15A. Nonetheless, on March 14, 2002, four days before the scheduled trial date, St. Paul settled the Kentucky Lawsuit for $70,000. St. Paul then reported the settlement to the National Practitioner Data Bank ("NPDB"), "an alert or flagging system intended to facilitate a comprehensive review of health care practitioners' professional credentials" by altering "State licensing authorities and health care entities that there **may** be a problem with a particular practitioner's professional competence or conduct." Document No. 32 ex. 11N.

In his First Amended Complaint, Dr. Kreit alleges that Defendant breached the Policy and exhibited bad faith conduct by "not really defending" the Kentucky Lawsuit and "inappropriately settling it over Kreit's objections," causing damage to Dr. Kreit's reputation in the medical community and an increase in his insurance premiums when the settlement was reported to the NPDB. Document No. 24 ¶ 19. Dr. Kreit further alleges that Defendant: (1) fraudulently and/or negligently misrepresented the benefits of the Policy and induced Dr. Kreit to purchase the Policy despite never intending to fulfill its obligations thereunder; (2) violated the DTPA by using ambiguous language in the Policy and failing to inform Dr. Kreit that he had an option to purchase a different malpractice policy that would have required Defendant to obtain Dr.

3

Kreit's consent before settling cases brought against him; (3) defamed Dr. Kreit by "wrongfully report[ing] the fabricated allegation made against [him] in the Kentucky [Lawsuit] to the NPDB"; and (4) breached a fiduciary duty owed to Dr. Kreit by settling the Kentucky Lawsuit without giving him an opportunity to continue defending himself in the Kentucky Lawsuit at his own expense. Id. ¶¶ 20-25. Defendant moves to dismiss and/or for summary judgment on all of Dr. Kreit's claims, arguing that they (1) are barred by the applicable statute of limitations, (2) lack any factual support, and/or (3) otherwise fail to state a claim for which relief may be granted. Document No. 30.

## II.  Summary Judgment Standard of Review[2]

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party must "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986).

---

[2] Because the Court considers evidence outside the pleadings, the summary judgment standard of review will be applied to St. Paul's motion.

4

Once the movant carries this burden, the burden shifts to the nonmovant to show that summary judgment should not be granted. Morris v. Covan World Wide Moving, Inc., 144 F.3d 377, 380 (5th Cir. 1998). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials in a pleading, and unsubstantiated assertions that a fact issue exists will not suffice. Id. "[T]he nonmoving party must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." Id.

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2513 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986). "If the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. Kelley v. Price-Macemon, Inc., 992 F.2d 1408, 1413 (5th Cir. 1993) (citing Matsushita, 106 S. Ct. at 1351). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." Id. Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary

judgment if it believes that "the better course would be to proceed to a full trial." <u>Anderson</u>, 106 S. Ct. at 2513.

III.   <u>Discussion</u>

A.   <u>Time-Barred Claims</u>

In his First Amended Complaint, filed January 31, 2005, Dr. Kreit alleges for the first time that St. Paul "purposely, or at the very least, negligently misrepresented the benefits of the Policy" before Dr. Kreit purchased the Policy and "fraudulently induced" him to purchase the Policy "with no intention of ever living up to its terms." *See* Document No. 24 ¶¶ 21-22.  Dr. Kreit further alleges that St. Paul violated the DTPA by failing to explain that Dr. Kreit "had an option to purchase another policy that would have required him to provide his consent prior to St. Paul being able to settle a case out from under his feet," and by using "ambiguous language in the Policy that was reasonably susceptible of two different meanings concerning the settlement of a claim." <u>Id.</u> ¶ 23.

St. Paul argues that Dr. Kreit's fraud, negligent misrepresentation, and DTPA claims are all barred by the applicable statutes of limitations.[3]  St. Paul contends that these claims,

_____

[3] Under Texas law, a suit for fraud is governed by a four-year statute of limitations, while suits for negligent misrepresentations and violations of the DTPA are governed by a

6

which center on St. Paul's alleged misconduct in connection with Dr. Kreit's purchase of the Policy, accrued when St. Paul issued the Policy in 1995. Thus, St. Paul argues, the limitations period for each of these claims expired before Dr. Kreit added the claims to his First Amended Complaint in January 2005.

In response, Dr. Kreit concedes that these limitations periods apply to his claims but argues that the limitations periods did not begin to run until he "discovered" St. Paul's alleged misconduct. *See* Document No. 32 at 12. According to Dr. Kreit, he did not discover the misconduct until he received a letter from D.J. Lynn ("Lynn"), the attorney hired by St. Paul to defend Dr. Kreit in the Kentucky Lawsuit, on March 30, 2004. <u>Id.</u>[4] Thus, Dr. Kreit argues, his claims are timely.

### 1.   Fraud and Fraudulent Inducement Claims

Contrary to Dr. Kreit's assertion, Texas law provides that a cause of action accrues, and the statute of limitations begins to

---

two-year statute of limitations. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 16.003(a), 16.004(a)(4); TEX. BUS. & COM. CODE ANN. § 17.565.

[4] In the letter, Lynn (1) outlined his assessment of the Kentucky Lawsuit; (2) explained to Dr. Kreit that pursuant to the terms of the Policy, he had "agreed that [St. Paul] had two absolute rights with respect to matters such as [the Kentucky Lawsuit]," including "the right to make any settlement [St. Paul] deemed appropriate"; and (3) explained to Dr. Kreit that under the Policy, he had not "reserved the right to consent or withhold consent of any settlement" of the Kentucky Lawsuit. *See* Document No. 32 ex. 1E.

7

run, when "a wrongful act causes some legal injury, even if the fact of the injury is not discovered until later, and even if all the resulting damages have not yet accrued." Hunton v. Guardian Life Ins. Co. of Am., 243 F. Supp. 2d 686, 698 (S.D. Tex. 2002) (Atlas, J.), *aff'd*, 71 Fed. Appx. 441 (5th Cir. 2003) (quoting Murphy v. Campbell, 964 S.W.2d 265, 270 (Tex. 1997)). "Thus, an action for fraud accrues when the fraud is perpetrated." Hunton, 243 F. Supp. 2d at 698 (citations omitted). "If the fraud is concealed from the plaintiff, however, the limitations period does not run until the plaintiff discovers the fraud or should have discovered the fraud through the exercise of reasonable diligence." Id. In such cases, "Texas courts apply the discovery rule or the fraudulent concealment doctrine as exceptions to the statute of limitations." Id. (explaining the discovery rule and fraudulent concealment doctrines).

In this case, neither the discovery rule nor the doctrine of fraudulent concealment tolls the statute of limitations because Dr. Kreit has failed to raise so much as a genuine issue of material fact that St. Paul's alleged misconduct was concealed from him or otherwise undiscoverable. Regardless of what, if anything, St. Paul's representatives may or may not have told Dr. Kreit about the nature of the Policy when he purchased it, the Policy itself plainly states that St. Paul had the right to settle claims against Dr. Kreit as St. Paul deemed appropriate. Although Dr. Kreit

8

contends that St. Paul "hid" the fact that the Policy did not contain a "right to consent" clause, the absence of such a "right to consent" clause was fully apparent and easily discoverable by reading the Policy itself.  This fact was therefore not "hidden" from Dr. Kreit, to whom the Policy was delivered.

Likewise, the limitations period for Dr. Kreit's fraudulent inducement claim, which is premised upon the argument that Dr. Kreit would not have purchased the Policy but for St. Paul's alleged misrepresentations and omissions, began to run when Dr. Kreit was allegedly defrauded into purchasing the Policy.  This is true even though the actual damage about which Dr. Kreit complains did not occur until much later.  Id. at 702-03.  Thus, Dr. Kreit's fraudulent misrepresentation, fraud, and/or fraudulent inducement claims are barred by the applicable four year statute of limitations.

2.  Negligent Misrepresentation Claim

In Texas, negligent misrepresentation claims sound in negligence, not fraud.  Id. at 703.  Much like the limitations period for fraud claims, however, the limitations period for negligent misrepresentation claims runs from "the commission of the negligent act, not the ascertainment of damages."  Id. (quoting Kansa Reinsurance Co., Ltd. v. Cong. Mortgage Corp., 20 F.3d 1362, 1372 (5th Cir. 1994)).  Thus, the limitations period for Dr.

9

Kreit's negligent misrepresentation claim began to run when St. Paul made the alleged misrepresentation in connection with Dr. Kreit's purchase of the Policy in 1995.   The negligent misrepresentation claim is therefore time-barred.[5]

3.   <u>DTPA Claim</u>

Dr. Kreit's DTPA claim is subject to a two year limitations period that commenced when "the false, misleading, or deceptive act or practice occurred," or when Dr. Kreit "discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice." TEX. BUS. & COM. CODE ANN. § 17.565; *see also* <u>Hunton</u>, 243 F. Supp. 2d at 703-04 (citing cases).   St. Paul's alleged unlawful acts all occurred in connection with Dr. Kreit's decision to purchase of the Policy in 1995.   Moreover, the discovery rule expressed in the statute does not apply to toll the limitations period because, as discussed above, a reading of the written Policy would have

---

[5] The discovery rule generally does not apply to negligent misrepresentation claims. <u>Hunton</u>, 243 F. Supp. 2d at 703, n.28-29. Even if the discovery rule and/or fraudulent concealment doctrine were applicable to Dr. Kreit's claim, however, the claim would still fail because Dr. Kreit was on notice of St. Paul's alleged misrepresentation from the date the Policy was delivered to him in 1995.  Moreover, when St. Paul first proposed a settlement to Dr. Kreit in a letter dated August 8, 1997, St. Paul pointed out in the letter that the Policy did not require St. Paul to obtain his consent to settle the Kentucky Lawsuit.   The Kentucky Lawsuit itself was finally settled on March 14, 2002, still more than two years before Dr. Kreit filed his negligent misrepresentation claim.

informed the insured of the Policy's actual terms.   Even if the discovery rule applied, however, Dr. Kreit should have discovered St. Paul's alleged unlawful acts no later than March 14, 2002, when St. Paul settled the Kentucky Lawsuit without his consent.   Dr. Kreit's DTPA claim, not alleged until January, 2005, is therefore barred by the statute of limitations.

B.   <u>Breach of Contract Claim</u>

Dr. Kreit claims that St. Paul breached the Policy by "abandoning the defense" of and "improperly settling" the Kentucky Lawsuit without obtaining his consent.  *See* Document Nos. 24 ¶ 19; 32 at 6.   Specifically, Dr. Kreit contends:

> Under the Policy, St. Paul had a duty to defend the [Kentucky Lawsuit].   Defending a case doesn't mean simply going through the motions and hiring an attorney to make a half-hearted 'discovery' on behalf of Kreit.   St. Paul breached that duty by, among other things, not really defending the case and inappropriately settling it over Kreit's objections.

Document No. 24 ¶ 19.   Kreit further alleges that St. Paul had a duty of "clearing his good name in court," which it breached by settling the Kentucky Lawsuit.   <u>Id.</u>

Under Texas law, insurance policies are subject to the same rules of construction as other contracts.   *See* <u>Mid-Continent Cas. Co. v. Swift Energy Co.</u>, 206 F.3d 487, 491 (5th Cir. 2000); <u>Balandran v. Safeco Ins. Co. of Am.</u>, 972 S.W.2d 738, 740-41 (Tex. 1998).   When construing a policy, the Court's primary concern is to

11

give effect to the written expression of the parties' intent.  *See*
Gonzalez v. Denning, 394 F.3d 388, 392 (5th Cir. 2004);  Forbau v.
Aetna Life Ins. Co., 876 S.W.2d 132, 133 (Tex. 1994).  The policy
must be considered as a whole, giving effect to each part, and the
terms used in the policy must be given their ordinary and generally
accepted meaning, unless the policy shows the words were meant in
a technical or different sense.  *See* Canutillo Indep. Sch. Dist. v.
Nat'l Union Fire Ins. Co., 99 F.3d 695, 700 (5th Cir. 1996);
Balandran, 972 S.W.2d at 741; Forbau, 876 S.W.2d at 133.

"'If a written contract is so worded that it can be given a
definite or certain legal meaning, then it is not ambiguous.'"
Gonzalez, 394 F.3d at 392 (quoting Nat'l Union Fire Ins. Co. of
Pittsburgh, Pa. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex.
1995)).  "On the other hand, if the contract is subject to two or
more reasonable interpretations after applying the pertinent rules
of construction, the contract is ambiguous, creating a fact issue
on the parties' intent."  J.M. Davidson, Inc. v. Webster, 128
S.W.3d 223, 229 (Tex. 2003).  However, "'[a] contract is not
ambiguous merely because the parties to an agreement proffer
conflicting interpretations of a term.'"  Gonzalez, 394 F.3d at 392
(quoting Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines, 278
F.3d 494, 497 (5th Cir. 2002)).

In this case, the Policy unambiguously provided St. Paul with
the authority to settle the Kentucky Lawsuit without obtaining Dr.

Kreit's consent.  The pertinent Policy language vests St. Paul alone with "the right to investigate, negotiate and settle any suit or claim if [St. Paul] think[s] that's appropriate."  Document No. 30 ex. A ("Additional Benefits").   Contrary to Dr. Kreit's assertion, the Policy does not provide that St. Paul can settle a case only upon determining that settlement is appropriate for and in the best interest of Dr. Kreit alone, and the term "appropriate" is not otherwise ambiguous.   Rather, the Policy places no qualifications or limitations on St. Paul's right to decide whether settlement is "appropriate."

Additionally, although St. Paul requested Dr. Kreit's consent to a settlement of the Kentucky Lawsuit, St. Paul made clear in its request to Dr. Kreit that it "does not have language in [its] policies that requires consent prior to settlement" but nonetheless "like[s] to secure consent as a courtesy to our policyholders." Document No. 30 ex. B.  Thus, St. Paul's correspondence with Dr. Kreit did not alter the terms of the Policy.[6]  Because the Policy did not obligate St. Paul either to obtain Dr. Kreit's consent to

---

[6] St. Paul's second request for Dr. Kreit's consent to the settlement did not reiterate, retract, or modify what had previously been written to him, namely, that the Policy contained no consent to settle provision and that his consent was being requested only as a courtesy to him.  *See* Document No. 32 ex. 15A. In making a second request, St. Paul did not waive any of its rights under the Policy, including its right to settle the Kentucky Lawsuit without Dr. Kreit's consent.  Id.  This request cannot reasonably be construed as modifying or altering the terms of the written Policy.

a settlement of the Kentucky Lawsuit or to take the Kentucky
Lawsuit to trial in order to "clear[] [Dr. Kreit's] good name in
court," St. Paul did not breach the Policy when it exercised its
discretion to settle the Kentucky Lawsuit.  St. Paul is therefore
entitled to summary judgment on Dr. Kreit's breach of contract
claim.

C.    Defamation Claim[7]

    Dr. Kreit also claims that St. Paul defamed him by wrongfully
reporting the settlement of the Kentucky Lawsuit to the NPDB, which
"resulted in the placement of a malpractice mark upon [Dr. Kreit]'s
record at the NPDB" and "tarnished" his "good name in the medical
community."  Document No. 24 ¶ 24.

    The NPDB was enacted as part of the Health Care Quality
Improvement Act of 1986 ("HCQIA"), 42 U.S.C. § 11101 *et seq.*, to,
*inter alia*, "restrict the ability of incompetent physicians to move
from State to State without disclosure or discovery of the
physician's previously damaging or incompetent performance."  42
U.S.C. § 11101(2).  Thus, the HCQIA requires medical professional

---

    [7] St. Paul recently filed its Second Amended Answer and
Affirmative Defenses, in which it asserts that Dr. Kreit's
defamation claim is barred by the applicable one year statute of
limitations because St. Paul reported the settlement to the NPDB on
March 20, 2002.  *See* Document No. 37 ¶ 28 (citing TEX. CIV. PRAC. &
REM. CODE ANN. § 16.002(a).  Although this defense appears to be
meritorious, *see* Wheeler v. Methodist Hosp., 95 S.W.3d 628, 636-37
(Tex. App.--Houston [1st Dist.] 2002, no pet.), St. Paul has not
amended its motion for summary judgment to include this ground.

liability insurers, such as St. Paul, that make payments in settlement of medical malpractice claims to report certain information pertaining to the payments, including the name of any physician on whose behalf the payment was made. Id. § 11131. The information provided in the report is confidential and can be accessed only by health care entities and only under limited circumstances, and the HCQIA includes a provision stating that "a payment in settlement of a medical malpractice action or claim shall not be construed as creating a presumption that medical malpractice has occurred." Id. § 11137(b), (d). Nonetheless, when information about a physician appears in the NPDB, those who search the NDPB may well suspect that the physician in fact committed malpractice, a suspicion that would tend adversely to affect the physician's medical practice. The HCQIA therefore confers immunity on any person who makes a report to the NPDB "without knowledge of the falsity of the information contained in the report." 42 U.S.C. § 11137(c). This "immunity for reporting exists as a matter of law unless there is sufficient evidence for a jury to conclude the report was false and the reporting party knew it was false." Brown v. Presbyterian Healthcare Servs., 101 F.3d 1324, 1334 (10th Cir. 1996).

In this case, St. Paul's medical malpractice payment report stated that a $70,000 payment had been made on behalf of Dr. Kreit in the Kentucky Lawsuit. See Document No. 32 ex. 4N. St. Paul

described the claim against Dr. Kreit as "allegations of failure to diagnose fractured calcaneus arising out of failure to document medical records," and described the settlement as "liability denied, compromised settlement of $70,000 reached." Id.[8] Nothing in the summary judgment evidence indicates that the information reported by St. Paul was untrue, and there is no summary judgment evidence that St. Paul knew that any of the reported information was not true.  To the contrary, St. Paul accurately described the plaintiff's allegations made against Dr. Kreit in the Kentucky Lawsuit, the terms of the settlement, and the fact that Dr. Kreit denied any liability on the claim.  Accordingly, Dr. Kreit has failed to raise so must as a genuine issue of material fact that he was defamed by the NPDB report, and his defamation claim fails as a matter of law.

---

[8] Dr. Kreit subsequently modified the report on April 16, 2002 by adding the following statement:

> This report is completely false, there is no settlement paid on my behalf.  The amount of $70,000 was paid on behalf of the reporting entity.  This case was settled without my permission, without my knowledge, and even before the testimony of my very important witness.  This settlement occurred suddenly few days before the trial after about seven years of discovery.  The plaintiff attorney had made several offers to settle that I rejected.  Then the reporting entity decided to settle after the plaintiff attorney agreed to accept a nuisance fee.  This decision to settle by the reporting entity is solely based on the reporting entity finantial [sic] best interest.

Document No. 32 ex. 5N.

D.   <u>Breach of Fiduciary Duty Claim</u>

Dr. Kreit further contends that "[a]n agency relationship undeniably existed between St. Paul and Kreit," such that he "should have had the right to control [St. Paul's] conduct in matters entrusted to [it]." Document No. 24 ¶ 25. By entering a settlement over his objections and ceasing to defend the Kentucky Lawsuit, Dr. Kreit argues, St. Paul disregarded his rights and best interest and "failed to meet a reasonable standard of care with respect to the duty that it owed to [him] to defend him in the Kentucky [Lawsuit]." <u>Id.</u>

Under Texas law, "[t]here is no general fiduciary duty between an insurer and its insured." <u>Wayne Duddlesten, Inc. v. Highland Ins. Co.</u>, 110 S.W.3d 85, 96 (Tex. App.--Houston [1st Dist.] 2003, rev. denied); *accord* <u>E.R. Dupuis Concrete Co. v. Penn. Mut. Life Ins. Co.</u>, 137 S.W.3d 311, 318 (Tex. App.--Beaumont 2004, no pet.); *see also* <u>In re Segerstrom</u>, 247 F.3d 218, 227 n.7 (5th Cir. 2001) ("Texas does not recognize a fiduciary duty between insurers and their insureds, only a duty of reasonable care"). "To impose an informal fiduciary relationship in a business transaction, the requisite special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the

17

suit." <u>Duddleston</u>, 110 S.W.3d at 96.   Dr. Kreit has neither
pleaded nor presented any evidence that a special relationship of
trust and confidence existed between St. Paul and himself prior to,
and apart from, his purchase of the Policy.   Because there is no
summary judgment evidence from which it could be inferred that
either a formal fiduciary relationship or an informal confidential
relationship existed between St. Paul and Dr. Kreit, St. Paul is
entitled to summary judgment on Dr. Kreit's breach of fiduciary
relationship claim.

E.   <u>Bad Faith Claim</u>

     Finally, Dr. Kreit alleges that St. Paul "exhibited bad faith
in its conduct toward Kreit in, among other things, the
representations made to [him] to get him to purchase the Policy, in
its so called 'defense' of the Kentucky [Lawsuit], and in its
conduct in reporting [him] to the NPDB."   Document No. 24 ¶ 20.
Dr. Kreit's allegations do not state a claim for bad faith.   "Under
Texas law, there is a duty on the part of the insurer to deal
fairly and in good faith with an insured in the processing of
claims." <u>Higginbotham v. State Farm Mut. Auto. Ins. Co.</u>, 103 F.3d
456, 459 (5th Cir. 1997).   Importantly, however, the Texas Supreme
Court has specifically declined to extend this duty to the
processing of insurance claims based on third party actions against
the insured. <u>Ford v. Cimarron Ins. Co., Inc.</u>, 230 F.3d 828, 831

18

(5th Cir. 2000) (citing <u>Maryland Ins. Co. v. Head Indus. Coatings</u> <u>& Servs., Inc.</u>, 938 S.W.2d 27, 28 (Tex. 1996)).   Rather, Texas law "recognizes only one tort duty regarding third party insurance cases, that being the duty stated in <u>Stowers Furniture Co. v. Am.</u> <u>Indem. Co.</u>, 15 S.W.2d 544 (Tex. Comm'n App. 1929, holding approved)."  <u>Id.</u>  Dr. Kreit's bad faith claim therefore fails as a matter of law.

Furthermore, Dr. Kreit cannot state a claim under the <u>Stowers</u> doctrine, which provides that an insurer owes to its insured a duty to exercise reasonable care in considering a settlement offer within the policy limits.  *See* <u>Ford</u>, 230 F.3d at 831; <u>Am.</u> <u>Physicians Ins. Exch. v. Garcia</u>, 876 S.W.2d 842, 862 (Tex. 1994). Dr. Kreit "is not alleging in this case a traditional <u>Stowers</u> claim in that [St. Paul] failed to settle a claim where there was an offer of settlement within policy limits." <u>Duddlesten</u>, 110 S.W.3d at 97.  Rather, it is Dr. Kreit's position that St. Paul wrongfully settled and paid an invalid medical malpractice claim against him. Such claims are not recognized under Texas law.  *See* <u>Ford</u>, 230 F.3d at 831-32; <u>Duddlesten</u>, 110 S.W.3d at 97; *see also* <u>RSR Corp. v.</u> <u>Great N. Ins. Co.</u>, 48 Fed. Appx. 916 (5th Cir. 2002); <u>French v.</u> <u>State Farm Ins. Co.</u>, 156 F.R.D. 159, 162 (S.D. Tex. 1994).

## IV.  <u>Order</u>

For the reasons set forth, it is

ORDERED that Defendant St. Paul Fire and Marine Insurance Company's Motion to Dismiss for Plaintiff's Failure to State a Claim or, in the Alternative, Motion for Summary Judgment (Document No. 30) is GRANTED, and Dr. Kreit's case is DISMISSED on the merits.

The Clerk shall notify all parties and provide them with a true copy of this Order.

SIGNED at Houston, Texas, on this 10th day of February, 2006.


Ewing Werlein, Jr.
United States District Judge

20